CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ISABEL BUSSARAKUM (Bar No. 295046)
(E-Mail:  isabel_bussarakum@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
TRENT TOMASOVICH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>TRENT TOMASOVICH,<br><br>　　　　　Defendant. | Case No. CR 19-53-JFW<br><br>**DEFENDANT TRENT TOMASOVICH'S SENTENCING POSITION; EXHIBITS**<br><br>**Hrng Date:** 8/29/2022<br>**Hrng Time:** 8:00 a.m. |

　　　Defendant Trent Tomasovich, through his counsel of record, Deputy Federal Public Defender Isabel Bussarakum, hereby files this sentencing position concurring with the Probation Officer's sentencing recommendation of 20 years in custody, followed by 3 years of supervised release.

　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　CUAUHTEMOC ORTEGA
　　　　　　　　　　　　　　　Federal Public Defender

DATED:  August 12, 2022　　　By　*/s/ Isabel Bussarakum*

　　　　　　　　　　　　　　　ISABEL BUSSARAKUM
　　　　　　　　　　　　　　　Deputy Federal Public Defender
　　　　　　　　　　　　　　　Attorney for TRENT TOMASOVICH

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................................... 1

II. CORRECTIONS TO THE PSR .......................................................................... 3

    A.    Page 1 and Paragraph 36 .......................................................... 3

    B.    Paragraph 36 .............................................................................. 3

    C.    Paragraph 42 .............................................................................. 3

    D.    Paragraph 51 .............................................................................. 4

III. OBJECTION TO SUPERVISED RELEASE CONDITION ................................ 4

IV. ARGUMENT ..................................................................................................... 5

    A.    Mr. Tomasovich's Background and Characteristics Support a Sentence No Higher Than 20 Years ...................................... 5

        1.    Mr. Tomasovich was exposed to ▮▮▮▮▮▮▮▮▮, born 1.5 months premature, and given up ▮ ▮▮▮▮y a bipolar, schizophrenic mother in an abusive relationship ................ 5

        2.    Growing up, Mr. Tomasovich suffered from extreme anxiety and a fear of abandonment, lacked coping skills, and struggled with his parents' perfectionism and emotional abuse ........................ 7

        3.    To fill the void ▮▮▮▮▮▮d belonging, Mr. Tomasovich turned to drugs ▮▮▮▮▮▮▮ ....................................................... 10

        4.    Meeting his biological family heightened Mr. Tomasovich's sense of rejection and lack of belonging .......................... 12

        5.    Mr. Tomasovich's nearly 4-year period of sobriety reflects his full potential to be a productive, even exemplary citizen ............... 13

        6.    A toxic relationship triggered Mr. Tomasovich's relapse and downward spiral toward rock bottom .............................. 15

        7.    Contributing to ▮▮▮▮▮▮▮▮▮▮▮▮iral is a previously ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ...... 16

        8.    Mr. Tomasovich's remorse, compassion, and intelligence further indicate a bright future with the right treatment ............................ 17

    B.    Nature and Circumstances of the Offense ............................... 19

    C.    The Need to Avoid Unwarranted Sentence Disparities ............ 20

    D.    Seriousness of the offense, respect for the law, just punishment, adequate deterrence, protection of the public, and needed rehabilitation .. 22

V. CONCLUSION ................................................................................................. 25

i

## SENTENCING MEMORANDUM

### I. INTRODUCTION

"In recent years, I have been worried that I would get a call saying Trent had overdosed.  I did not expect to hear that he had played a part in two other people's overdoses."  (*See* Ex. D at 12 (Karen Lembke, cousin to Mr. Tomasovich).)

In this tragic case, an extremely thin veil separated Mr. Tomasovich from the two people who overdosed.  On another day, another hour, another moment, it could just have easily been Mr. Tomasovich who overdosed.  He was not some drug kingpin profiting massively from the widespread distribution of drugs.  He was not a violent person who sought to wreak havoc on other people.  He was just a lost, young man with a traumatic backstory:  a birth mother who suffered from bipolar disorder and schizophrenia, used crack cocaine during pregnancy, and gave Mr. Tomasovich up at birth because she was in an abusive relationship; adoptive parents who met all material needs, but were either emotionally absent or emotionally abusive; a longstanding and severe battle with anxiety, depression, and abandonment issues; repeated misdiagnosis of his mental health issues, and thus, a lack of proper treatment; and a toxic relationship with a manipulative girlfriend also struggling with addiction.  All of this led Mr. Tomasovich back into the grip of addiction a couple of years prior to the charges in this case.  By the time he met G.A.M. on July 13, 2018, he was near rock-bottom, having lost his job and turned to selling small amounts of the same drugs he was using in order to buy more.  When he was arrested a year later, he had hit rock-bottom and was found pan-handling on a freeway offramp in a drug-induced trance.

The death of G.A.M. and I.F. are tragedies, and Mr. Tomasovich will have to live with that guilt for the rest of his life.  But he certainly did not intend for anyone to overdose, and he is extremely remorseful for what happened in this case.  Along with G.A.M. and I.F., he was one of the millions of people in this country suffering from the disease of opioid addiction.  This epidemic will not be solved through lengthy terms of incarceration for user-dealers who sell to fund their own habit.  "Research consistently

1

shows that neither increased arrests nor increased severity of criminal punishment for drug law violations results in less use (demand) or sales (supply)."[1]  Likewise, "there is not a shred of evidence that [drug-induced homicide] laws are effective at reducing overdose fatalities."[2]  Instead, "these efforts exacerbate the very problem they seek to remediate by discouraging people who use drugs from seeking help and assistance."[3]  Imprisonment serves to punish and incapacitate, but it does not address the root cause of the drug epidemic.

Despite the genetic and environmental factors that laid down the foundation of an "ill-fated" developmental trajectory, as a neuropsychiatric expert concluded, Mr. Tomasovich has so much potential to lead a sober, law-abiding life that contributes to his family, friends, and the community.  As detailed further below, Mr. Tomasovich has always displayed compassion and care for others since he was a child; he is fairly intelligent, which increases his chances of success when he is released; and he has previously demonstrated, during a nearly 4-year period of sobriety, that he can not only be a productive, but even an exemplary, citizen with the right treatment and support system.  For all of the reasons stated in this brief, the 20-year mandatory minimum is more than sufficient to punish Mr. Tomasovich, and is consistent with, if not more punitive, than other sentences imposed in similar circumstances.

---

[1] Drug Policy Alliance, *An Overdose Death Is Not Murder: Why Drug-Induced Homicide Laws Are Counterproductive and Inhumane* at 2 (2017), *available at* https://drugpolicy.org/sites/default/files/dpa_drug_induced_homicide_report_0.pdf.

[2] *Id.* (emphasis removed); *see also id.* ("In fact, death tolls continue to climb across the country, even in the states and counties most aggressively prosecuting drug-induced homicide cases.  As just one example, despite ten full-time police officers investigating 53 potential drug-induced homicide cases in Hamilton County, Ohio in 2015, the county still recorded 100 more opioid-related overdose deaths in 2016 than in 2015."

[3] *Id.*

## II. CORRECTIONS TO THE PSR

### A.    Page 1 and Paragraph 36

Both page 1 and Paragraph 36 of the PSR indicate that a bench warrant was issued on February 1, 2019 for a probation violation in Los Angeles County Superior Court Docket, No. LA088106. (PSR at 1 and ¶ 36.)

Attached as Exhibit A are the Minutes from Case No. LA088106.  They show that the bench warrant from February 1, 2019 was recalled on June 23, 2021.  (Ex. A at 10-11.)  Then on December 16, 2021, probation was revoked and terminated, and all proceeding were terminated.  (*Id.* at 13-14.)  Mr. Tomasovich requests that the PSR be revised to reflect that the bench warrant was recalled and that probation was terminated, as this clarification should lower his BOP security classification points.

### B.    Paragraph 36

Paragraph 36 of the PSR reflects a DUI conviction in Ventura County Superior Court, Docket No. 2013016774, and a sentence of 60 days' jail and 36 months' probation. (PSR ¶ 36.)

Mr. Tomasovich just wishes to add and clarify that his conviction in this case was subsequently set aside under California Penal Code § 1203.4, and his case was dismissed on December 23, 2016.  (Ex. B at 1.)  Mr. Tomasovich requests that the PSR be revised to reflect that his conviction was set aside, and the case was dismissed.

### C.    Paragraph 42

Paragraph 42 of the PSR refers to an arrest on November 17, 2018 in Ventura County, and notes a disposition of: "Unknown, no record of court action."  (PSR ¶ 42.)

Attached as Exhibit C is a December 3, 2021 email from Chris Harman, Supervising Attorney, Major Crimes Unit, District Attorney's Office, County of Ventura.  In that email, Mr. Harman explains that no case was ever filed against Mr. Tomasovich for his arrest on November 17, 2018.  (Ex. C at 1.)  Moreover, the "statute of limitations has since expired," and thus, "no charges can now be filed for the charges he was arrested for."  (*Id.*)  In light of this information, Mr. Tomasovich requests that

3

the PSR be revised to reflect a disposition of "Prosecution declined" in Paragraph 42, as this clarification should lower his BOP security classification points.

**D.     Paragraph 51**

Paragraph 51 of the PSR indicates that Mr. Tomasovich's biological mother, Jaime Eddinger was "presently incarcerated at the Federal Medical Center Carswell in Texas."  (PSR ¶ 51.)

To provide more information, Ms. Eddinger was, at the time of the PSR, incarcerated in a federal case for transporting two individuals across the U.S.-Mexico border.  *See United States v. Jaime Lynn Eddinger*, Case No. 4:19-cr-01211-RM-LCK (D. Ariz. Apr. 27, 2019).  During that federal case, Ms. Eddinger was found to be incompetent, and was committed to FMC Carswell for restoration.  *Id.* at ECF No. 30. In the government's sentencing memorandum, it was noted that Ms. Eddinger was diagnosed with schizophrenia and bi-polar disorder in 1998, and that the offense was the result of drug use that coalesced around her mental health condition.  *Id.* at ECF No. 71.  After restoration, she was sentenced on June 25, 2020 to time served, and was released from custody.  *Id.* at ECF Nos. 56, 76; *see also* Ex. D at 24.

### III. OBJECTION TO SUPERVISED RELEASE CONDITION

Proposed Supervised Release Condition No. 8 states:  "The defendant shall not obtain or possess any driver's license, Social Security number, birth certificate, passport or any other form of identification in any name, other than the defendant's true legal name, nor shall the defendant use, any name other than the defendant's true legal name without the prior written approval of the Probation Officer."

The first part of this Proposed Condition—prohibiting Mr. Tomasovich from possessing certain documents in another name—is not reasonably related to the factors in 18 U.S.C. § 3553(a)(1) or (a)(2)(B)-(D) as statutorily required.  *See* 18 U.S.C. § 3583(d).  Mr. Tomasovich has never possessed identity documents in someone else's name.  In one previous arrest, he provided 2 false names to the police, but he did not provide any false identity documents.  (PSR ¶ 42.)  Nor are false names or identity

4

documents part of the instant offense.  Therefore, the first part of Proposed Condition No. 8 should be stricken because it is not reasonably related to the nature and circumstances of the offense, or Mr. Tomasovich's history and characteristics.

## IV. ARGUMENT

The Sentencing Reform Act of 1984 governs sentencing decisions.  *United States v. Booker*, 543 U.S. 220, 260-61 (2005); 18 U.S.C. § 3553(a).  The "overarching" directive of sentencing is that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  This "parsimony principle" is the key requirement that a sentence must satisfy.  *See also Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) (reaffirming prior opinions stating that the guidelines are not to be presumed reasonable); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*) (sentencing guidelines to be given no more weight than any other § 3553(a) factor).  Considering all of the factors set forth in 18 U.S.C. § 3553(a), a 20-year sentence is sufficient (if not more than sufficient) to comply with the purposes of sentencing.

## A.   Mr. Tomasovich's Background and Characteristics Support a Sentence No Higher Than 20 Years

An extensive constellation of genetic and environmental difficulties led Mr. Tomasovich down an unfortunate path to the charged offense.  This tremendous mitigation supports a sentence no higher than the 20-year mandatory minimum.

### 1.   Mr. Tomasovich was exposed to ███████████, born 1.5 months premature, and given up for adoption at birth by a bipolar, schizophrenic mother in an abusive relationship

Mr. Tomasovich was adopted at birth by Theodore ("Ted") and Ruth Elizabeth ("Beth") Tomasovich.  As was the custom at the time, the Tomasoviches placed an adoption advertisement in a newspaper.  (PSR ¶ 47.)  In response to the advertisement, they received a phone call from Jaime Von Someren (now Jaime Lynn Eddinger) who

5

told them she was 7 1/2 months pregnant in Arizona.  (PSR ¶ 48; Ex. D at 1.)  Just a few days later, she called again, saying, "Hurry, hurry," as she was in labor.  (PSR ¶ 49; Ex. D at 1.)  The Tomasoviches rushed to Arizona where they were greeted by a baby boy weighing in at just over 5 lbs.  (PSR ¶ 49; Ex. D at 1.)  At the time, there were some red flags, including that the delivery doctor at the hospital said she would have performed a toxicology screen had she known more information.  (PSR ¶ 50.)  But the Tomasoviches were so overjoyed at the prospect of adopting a son that they overlooked these red flags.

Jaime later admitted to using methamphetamine, heroin, and other illegal drugs to Ted and Beth.  (*Id.*)  Today, Jaime acknowledges that she used crack cocaine while pregnant with Mr. Tomasovich, and that she was in a "bad relationship with his biological father."  (Ex. D at 24.)  We also know that she was diagnosed with bipolar disorder and schizophrenia in 1998.  *See United States v. Jaime Lynn Eddinger*, Case No. 4:19-cr-01211-RM-LCK, ECF No. 71 (D. Ariz. June 17, 2020).  And we know that in 2019, the combination of her mental health issues and drug use was severe enough to lead to her incompetence in a federal case, and to require restoration through antipsychotics at a BOP facility.  *Id.* at ECF Nos. 30, 56, 71, 76.



**2.     Growing up, Mr. Tomasovich suffered from extreme anxiety and a fear of abandonment, lacked coping skills, and struggled with his parents' perfectionism and emotional abuse**

Approximately 1 week after birth, Mr. Tomasovich was taken by his adoptive parents to San Marino, California where they lived with their 4-year old adopted daughter, Jessica ("Jessie").  (PSR ¶¶ 47, 50.)  Despite the affluent family and neighborhood, Mr. Tomasovich struggled.

As long as he and those around him can remember, Mr. Tomasovich has been plagued by anxiety and a fear of abandonment.  (*Id.* ¶ 55.)  As a child, he slept on the floor of his parents' bedroom until 7th grade because of an underlying and persistent

fear that they would leave.  (*Id.*)  While he could not articulate why he thought this, he knew from a young age that he was adopted.  A close family friend, Linda Gustafson, recalls how Mr. Tomasovich "did not have the same coping skills as kids his age," and how he "would cling to his mother and have extreme anxiety if Beth was not near him." (Ex. D at 18.)  He had such anxiety that he could not sleep over at Linda's house because he could not bear "the thought of being away from home."  (*Id.*)  "As he got older, his anxiety only grew."  (*Id.*)

Mr. Tomasovich also struggled to live up to his father's expectations.  (PSR ¶ 58.)  His father was a successful businessman who had been a star athlete in college. (Ex. D at 6.)  He repeatedly drilled into Mr. Tomasovich the absolute need to be "a scholar and an athlete."  (PSR ¶ 58.)  Mr. Tomasovich tried his best to live out this mantra.  But he did not have the same height or athletic physique that his father had— an obvious difference that subtly reminded Mr. Tomasovich every day that he was adopted.  (*See* Ex. D at 21 ("[Trent] told me about how difficult it was to live up to family expectations.  Both his father and Uncle Mike were very successful student athletes who excelled at multiple sports and earned full scholarships to . . . Georgia Tech University.  It helped that they were both very tall.  Trent, who was always small for his age realized that he was never going to obtain their physical status.").)

Mr. Tomasovich also "struggled to keep up" academically in the competitive schools in San Marino.  (*Id.*)  "[H]e was working as hard as he could just to keep from failing."  (*Id.*) ██████████████████████████████████ ██████████ since early adolescence, ██████████████ in the 6th grade, and ██ ██████████████████ beginning in the 7th grade.  (PSR ¶ 79-80; Ex. D at 14 ("Like many adoptees, Trent . . . had some ████████████████████████," which "can lead to anxiety and depression as a child gets older.").)

While some of these issues may not seem that unusual, Mr. Tomasovich suffered from an intense longing to belong and fit in, and the suffocating suspicion that he did not.  (PSR ¶ 57.)  Moreover, other family members provide key insight into Mr.

8

Tomasovich's adoptive family, illustrating that "[i]n spite of the pretty surface," it was "a broken home." (Ex. D at 8.)

Mr. Tomasovich's older adopted sister, Jessie, explains that "[w]hile [their parents] provided financially there was absolutely no love just an occasional phony shell of it." (*Id.*) "Growing up Trent had a lot of emotional turmoil. He will defend our parents, but this is a coping mechanism. It was too painful for him to come to grips with the way they treated us. I saw Ted make him cry regularly. It was torture." (*Id.*) "Our parents didn't discipline us, but they verbally abused us. . . . our parents would belittle both Trent and I, insult us and make us feel awful about ourselves." (*Id.*) Jessie's own "depression became so severe [she] was hospitalized." (*Id.*; *see also* Ex. D at 11 ("Since the beginning of 2020, Jessie has been in and out of hospitals for being a suicide risk."))

Their cousin, Karen Lembke, also explains that while Ted and Beth looked like "the ideal parents," "there is a level of deception to that idea." (Ex. D at 11.) She states, "Trent was raised by parents who are not emotionally validating or available, who often used phrases like 'children are to be seen but not heard,' and exhibit narcissistic behaviors that force the children's needs to be second to the parents'." (*Id.*) Karen herself has struggled with anxiety and depression most of her life, and believes that her mom and Mr. Tomasovich's mom had a similar parenting style: "avoidant, emotionally abusive, narcissistic, and inconsistent." (*Id.* at 12.)

Given the amount of pressure that Ted must have put on himself—a man who committed suicide at age 73 because of unseemly financial difficulties, leaving behind his wife alone, while his only son sat in jail facing 20 years or more (Ex. G at 2-3)— one can only imagine the amount of pressure he placed on Mr. Tomasovich. The combination of Mr. Tomasovich's low self-esteem and abandonment issues, and his adoptive parents' perfectionist standards and emotional abuse, was perhaps the worst possible match. As Dr. Trampush explains in clinical terms, ████████████

9

1　████████████████████████████████████████████████████████

2　███████████████████████████████████ (Ex. G at 28.)

### 3. To fill the void of identity and belonging, Mr. Tomasovich turned to drugs ███████████████

Striving to be "a scholar and an athlete" as his father required, Mr. Tomasovich played numerous sports growing up and put a lot of effort into high school football. He "joined the football summer conditioning program" and proudly "put on 20 lbs of muscle." (Ex. D at 21.) His hard work seemed to pay off when he got a starting position, but later in the season, he was knocked out with a concussion during a play. (PSR ¶ 58; Ex. E at 1.) As a result, he was unable to play for the rest of the year and fell behind the other players, resulting in his position being taken for sophomore year. (Ex. E at 1.) He quit football his junior year, finally unable to deal with the pressure from his father who told him that if he could not overcome the pain and play through it, he would never succeed in life.[4] (*Id.*)

It is hard to capture the psychological impact of quitting football. But Mr. Tomasovich lost a big part of his identity, his social network, and the part of him that his father seemed to value most. (PSR ¶¶ 59, 61; Ex. E at 1.) He tried to pivot to boxing, but could not continue after breaking his hand. (PSR ¶ 60; Ex. E at 1.) He was no longer a scholar and an athlete. He felt like a failure. It contributed to the nagging sense that he did not belong in his adoptive family or in the well-to-do neighborhood they lived in. (PSR ¶ 61; Ex. E at 1.) Lacking emotional support from his parents and friends, his anxiety ballooned, his depression deepened, and he turned more and more to drugs to quell his racing mind. (PSR ¶¶ 62, 84; *see also* Ex. D at 6-7.)

---

[4] Perhaps one final example of Ted's obliviousness to his son's emotions, or refusal to accept the impact of his parenting style, Ted wrote in his letter of support that his relationship with Mr. Tomasovich was not affected by Mr. Tomasovich's decision to quit football. (Ex. D at 6.) In contrast, Mr. Tomasovich's own letter written at the time in 2008 while at the Wilderness program clearly shows otherwise. (Ex. E.)

1     Shortly after quitting football, Mr. Tomasovich began ███████████
2     (PSR ¶ 82.)   Six months later, he ████████████████████████. (*Id.* ¶ 83.)
3     Less than a month later, Mr. Tomasovich ████████████████████████████████
4     ██████████████ on June 1, 2008.  (*Id.* ¶¶ 84, 85.)  To deal with his drug use ██
5     ██████, his parents enrolled him in a Wilderness Residential Program.  (Ex. D at 7.)
6     But they did not tell Mr. Tomasovich about their decision.  Instead, the program sent
7     two large men who entered Mr. Tomasovich's bedroom in the middle of the night on
8     June 23, 2008, and forcibly escorted him into a car, drove him to airport, and got him
9     on a plane to Utah.  (PSR ¶ 86.)  This was just one of the many controversial methods
10    used by the program.  (*See, e.g.*, *id.* ¶ 87.)  Corrective outdoor programs like
11    Wilderness have been widely criticized due to conditions characterized as abuse, which
12    has even led to a number of deaths.[5]  Despite an investigation into these deaths the year
13    before, the Tomasoviches sent their son anyway.  Fortunately, Mr. Tomasovich was
14    able to complete the Wilderness program, transition to the Crossroads Academy (for
15    boys struggling with substance issue), and complete his last year of high school at
16    Dorius Academy in Utah.  (PSR ¶ 110.)
17         After finishing up in Utah, Mr. Tomasovich returned home to San Marino in
18    April 2009, and enrolled at Santa Barbara City College in August 2009.  (*Id.* ¶ 111.)
19    Unfortunately, the roommate he found on Craigslist turned out to be a drug addict, who
20    accused Trent of stealing his drugs and threatened him with a gun.  (*Id.* ¶ 64; *see also*
21    Ex. D at 7.)  Feeling unsafe, Mr. Tomsaovich moved back home, and did not complete

---

[5] *See, e.g.*, Suzanne Struglinski, Deseret News, *Investigations ordered into wilderness therapy camps in Utah and elsewhere*, Oct. 11, 2007, *available at* https://www.deseret.com/2007/10/11/20046403/investigations-ordered-into-wilderness-therapy-camps-inutah-and-elsewhere; Sulome Anderson, The Atlantic, *When Wilderness Boot Camps Take Tough Love Too Far*, Aug. 12, 2014, *available at* https://www.theatlantic.com/health/archive/2014/08/whenwilderness-boot-camps-take-tough-love-too-far/375582/.

11

the semester at college.  (PSR ¶ 64.)  His father described the situation as "negative to his recovery and sobriety."  (Ex. D at 7.)

### 4.    Meeting his biological family heightened Mr. Tomasovich's sense of rejection and lack of belonging

Jessie explains that one advantage she had over Mr. Tomasovich was a loving "birth mother who took [her] in as a young adult and healed [her] wounds and taught [her] life skills that [she] never would have had otherwise."  (*Id.*)  Mr. Tomasovich did not have the same experience.

Several months after leaving Santa Barbara and returning home, Mr. Tomasovich visited his birth mother and biological siblings in July 2010 in Tucson, Arizona.  (PSR ¶ 65.)  Upon arrival, he was shocked by what he found.  (Ex. D at 21 (His Uncle Ric Long writes, "'My God, they're all drug addicts and thieves,' he told me.").)  His mother was a long-time addict, who, when she learned that Mr. Tomasovich had found and used her stash of drugs, slashed at him with a box cutter.  (PSR ¶ 66.)  His older brother was also an addict who struggled with mental health issues.  While there, Mr. Tomasovich got a job as a cook and pizza delivery boy to help out.  (*Id.* ¶ 116.)  Seeing that his biological family was so different from his adoptive one, and that his family members struggled with addiction just like him, made him feel even more like an outcast from his adoptive family.

However, he did not feel at home with his biological family either.  He was hurt to learn that he had an older brother and a younger sister from the same father, and a younger half-brother, and he was the only child his mom gave up for adoption.  (PSR ¶ 65.)  Learning that he was the only one given up made Mr. Tomasovich feel rejected by his biological family.  (*See* Ex. D at 16 ("Trent's birth mother was a drug addict and alcoholic who told Trent that he had been the only one of his siblings to be put for adoption.  There was no celebration for Trent, only demeaning rejection.  It is difficult to imagine the emotional and psychic damage such a response would have had . . . .").)  The feeling was only compounded when he called the man who was supposedly his

biological father, Kevin Leusse.  Kevin told Mr. Tomasovich his mother "was a slut and a whore and [Trent] could be anyone's kid." (PSR ¶ 67; *see also* Ex. D at 7.)

Mr. Tomasovich felt like he did not belong anywhere—neither in San Marino with his well-to-do adoptive family, nor in Arizona with his biological mom and siblings who had forged their own lifelong bond, and certainly not with his supposed biological father who disowned him.  His 6 months in Arizona exacerbated the feeling he had always had of not belonging.  These feelings propelled him further into his addiction when he returned to California.  (Ex. D at 16 ("[I]t is my feeling that the enormous rejection experienced by Trent fueled his propensity to addiction.").)

### 5.    Mr. Tomasovich's nearly 4-year period of sobriety reflects his full potential to be a productive, even exemplary citizen

After returning to California, Mr. Tomasovich struggled for 2 years with his addiction.  Finally sick with that life, Mr. Tomasovich told his mom Beth he wanted to get sober, and checked into ▮▮▮▮▮▮ for detox and residential drug treatment.  (Ex. D at 7; PSR ¶ 103.)  As Christopher Howard, ▮▮▮▮▮▮▮▮▮, recalls, "Trent entered ▮▮ afraid of the social world with virtually no life skills.  He was socially withdrawn and had a difficult time processing his feelings in the group dynamic, which we believed stemmed from attachment issues surrounding his adoption." (Ex. D at 27.)  While in treatment, Mr. Tomasovich also started ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Mr. Allen writes, "I came to be very fond of Trent and found him to be a personable, sincere, but deeply wounded and extremely fragile young man whose only coping skills seemed to be self medicating his depression, anxiety and deep feelings of shame.") (Ex. D at 25.)  "I came to see that this was a person who was born traumatized ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮" (*Id.*)  While neither he nor his

13

1    parents reported trauma or neglect, Mr. Tomasovich also ███████████████

2    ███████████████████████████████████████████████████[6] (*Id.*)

3    　　However, Mr. Tomasovich "responded well to treatment." (*Id.*)  Christopher

4    Howard states: "Over the course of 12 months Trent became a man of refined

5    character.  He was an upstanding member and leader of the community at ████ and

6    twelve-step communities.  He completed his twelve steps with his sponsor, began

7    service work with a number of sponsees, including my current manager at ████

8    ████." (Ex. D at 27.)  His mother, Beth, also recalls that when they visited Mr.

9    Tomasovich at the ████ on Sundays, "many of the clients came up to us and said

10   how helpful Trent was in their recovery.  He would listen, not judge and just sit with

11   them." (Ex. D at 2.)  Theodoros Kapogianis, a housemate at his sober living facility

12   also said, "I was most impressed by his level of personal accountability and

13   selflessness." (*Id.* at 29.)  Mr. Tomasovich once took responsibility for Theodoros's

14   mistake.  When asked why, Mr. Tomasovich responded, "we were on a team [and] our

15   successes and failure were one and the same." (*Id.*)

16   　　This is the beginning of a nearly 4-year period of sobriety, stability, and

17   productivity for Mr. Tomasovich.  (PSR ¶ 97.)  During this time, he maintained

18   housing, first in sober living, and then in his own apartment.  He was able to hold down

19   steady employment, first as a line cook at a restaurant, and then as a pet groomer.  (PSR

20   ¶¶ 112-114.)  Those who knew Mr. Tomasovich at this time write glowingly about how

21   well he was doing.  (*See, e.g.*, Ex. D at 8.)  This stretch of sobriety demonstrates Mr.

22   Tomasovich can return to being a productive, even exemplary citizen, with the right

23   treatment and support system.

24

25

26

27   ────────────

28   　　[6] This perhaps can be explained by the emotionally abusive upbringing that Mr.
     Tomasovich's sister, Jessie, and cousin Karen describe in their letters of support.

### 6.    A toxic relationship triggered Mr. Tomasovich's relapse and downward spiral toward rock bottom

Unfortunately, Mr. Tomasovich relapsed in December 2016 when he found out that his girlfriend was cheating on him. (PSR ¶ 113.)  The revelation, which would be upsetting to many, triggered Mr. Tomasovich's severe abandonment issues and deeply-held insecurities about not belonging anywhere and not being loved by anyone. (Ex. D at 28 ("It became clear that the attachment issues he struggled with were clouding his judgment.  He withdrew further form his network and dove deeper into the relationship [with his girlfriend], which ultimately le[d] to relapse."))  He relapsed and entered a downward spiral.  His girlfriend, whom he met at NA meetings and who was also a recovering addict, also relapsed.  They got back together and used together.  After relapsing, Mr. Tomasovich lost his job as a pet groomer.  (PSR ¶ 112.)  Desperate to keep using, he began selling small quantities of the drugs he was using to support his habit.  (Ex. D at 9 ("I believe he sold drugs because it was the only way he could get enough money to feed an unfathomably powerful addiction/disease that had escalated over time.").)

During this rock bottom period, Mr. Tomasovich did make several attempts to get help.  In December 2018, he attended ████ for detox.  (PSR ¶ 106.)  On January 4, 2019, he attempted to return to ██ residential treatment program, but was unable to do so because his parents could no longer afford it.  (*Id.* ¶ 107.)  On January 24, 2019, Mr. Tomasovich was released from county jail and directed to go to ███ ███ for residential treatment.  He did so, but ████████ would not accept him because he was ███████████████ (*Id.*)  Mr. Tomasovich left and began living on the streets, homeless.  By the time he was arrested on July 23, 2019, he was "panhandling on the freeway off-ramp . . . in a euphoric trance due to being under the influence of heroin."  (PSR ¶ 13.)  When additional officers arrived to apprehend him, "he was still in his drug-induced coma."  (*Id.*)

15

7.    **Contributing to Mr. Tomasovich's life path and downward spiral is a previously** 

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

### 8.    Mr. Tomasovich's remorse, compassion, and intelligence further indicate a bright future with the right treatment

Not only does Mr. Tomasovich's prior period of sobriety demonstrate that he can do well with the right support and treatment upon release, but so do other positive character traits, including his remorse, compassion, and intelligence.

Mr. Tomasovich's family and friends know that he would never intend to harm or hurt anyone. Quite the opposite, they all speak of the caring, compassionate, and thoughtful nature that he has demonstrated since childhood, and describe the crushing remorse that he feels today:

- "Trent is an empathetic and compassionate person. Since he was young, he had an understanding for those that had less. When he was five, he made friends with a homeless man, Diego, who was often on the street near our grocery store. He often gave him part of his meal from the local B-Man's burger, or a Starbucks drink, or fresh fruit from Ralphs." (Ex. D at 1.)

- Trent "was a very thoughtful boy, especially to the disadvantaged. One of my sons, Eric, is blind and Trent took him under his wing from an early age. He would watch out for Eric in ways that may sound simple to a sighted person, but to a blind person they are very compassionate. For example, Trent would be sure Eric got his share of pizza when Beth served it for dinner, and he would be sure Eric was never left behind when the group was heading off to an activity." (*Id.* at 18.)

- "His tough-guy tattooed exterior was a façade covering a person who is compassionate, always willing to listen, animal lover with a heart of gold." (*Id.* at 12.)

- ". . . I have never known Trent to display an ill will or cruelty. . . . Even when our parents were psychologically brutal Trent would get upset and angry but not cruel. He had a kind heart. I think his choice to sell dangerous drugs came from a place of unimaginable chemical addiction and not any cruel intentions to harm. He did not intend to kill anyone. . . ." (*Id.* at 9.)

- "[W]hile this young man is definitely a drug addict who did something incredibly reckless and wrong, he is not a violent, aggressive, malevolent or villainous person. In fact I know him to have a kind and giving heart, especially when he is sober and functioning well in the world." (*Id.* at 26.)

- "Even in periods where addiction has run rampant in his life. He is a kind-hearted man that never hesitates to put the needs of others before his own." (*Id.* at 29.)

- "I don't know the specifics of what happened. But I do know one thing: Trent would never knowingly harm or hurt anyone." (*Id.* at 15.)

- "Knowing Trent, I truly believe he is experiencing the most intense remorse possible over the tragic deaths of the two individuals who purchased Fentanyl." (*Id.* at 17.)

- "Trent would never harm anyone intentionally. This is not in his character. I know he is devastated that his actions played a part in these tragic events. Because of what has happened and because he realized that he can live a sober life again, I do not believe that he would use or distribute drugs again." (*Id.* at 7.)

Furthermore, in spite of the obstacles Mr. Tomasovich has faced throughout his life, his test scores indicate above-average intellectual skills. (Ex. G at 27.) Thus, with the proper support and treatment in place, he may "be reasonably well positioned to turn his life around." (*Id.*)

**B.    Nature and Circumstances of the Offense**

As described above, Mr. Tomasovich was himself an addict who was dealing with mental health issues by self-medicating with heavy opioid use.  He relapsed in December 2016, which led to losing his job, the stability he had earned, and the good judgment he possessed when sober.  Without a job, Mr. Tomasovich resorted to selling small amounts of the same drug he was using—first heroin, then fentanyl—to support his own habit.

On July 13, 2018, he sold G.A.M. ½ a gram of fentanyl for $80.  That is half the weight of 1 paperclip, which weighs about 1 gram.  The amount is so low that had no one overdosed, Mr. Tomasovich would be looking at an offense with no mandatory minimum, and a guidelines range of just 15-21 months (based on an offense level of 12 for less than 4 grams of fentanyl, a 2-level decrease for acceptance of responsibility, and criminal history category IV).

Of course, the tragedy is that two people overdosed.  But Mr. Tomasovich had absolutely no intent to harm those individuals, or anyone else for that matter.  (*See supra* Section IV.A.7.)  It is clear that he did not seek out G.A.M.  It was G.A.M. who sought a source of drugs from her friend.  (PSR ¶ 7.)  She was the one who reached out to Mr. Tomasovich first via text message.  (*Id.* ¶ 8.)  She agreed to purchase 1/2 a gram, met Mr. Tomasovich in a parking lot, bought the drug, and ingested it.  (*Id.*)  Mr. Tomasovich was transparent with G.A.M. about what he was selling, making sure she knew it was fentanyl and that it was much stronger than heroin.  (*Id.*)  The fact that G.A.M. later overdosed was largely outside of Mr. Tomasovich's control because there was no indication that something was wrong with the fentanyl.  Indeed, Mr. Tomasovich and his girlfriend were using the same fentanyl.  Nor was there any way for Mr. Tomasovich to know that many links down the causal chain after G.A.M. overdosed from the fentanyl, her friend's boyfriend, I.F., would later ingest it.  (*Id.* ¶ 9-11.)  Mr. Tomasovich did not sell anything to I.F., know who he was, or ever met him.

19

In sum, weighing in mitigation is the fact that Mr. Tomasovich was suffering from his own severe addiction and mental health issues, he sold a tiny amount of fentanyl, and he had no intent of hurting anyone.

## C.    The Need to Avoid Unwarranted Sentence Disparities

Prosecutions for overdose deaths have largely targeted user-dealers like Mr. Tomasovich.[7]  When given the opportunity, courts have sentenced user-dealers to custodial terms substantially below 20 years.  For example, in *United States v. Marvita Roxanna Causey*, the defendant provided purported heroin that actually contained fentanyl to two people, one of whom (the defendant's cousin) died as a result.  The defendant was sentenced to 37 months' imprisonment.  Case No. 6:18-cr-02061-LRR-MAR, ECF No. 37 (N.D. Iowa 2019).  In *United States v. Richard Mansfield*, a street-level dealer who sold heroin laced with fentanyl to a customer resulting in a fatal overdose received a sentence of 108 months' imprisonment.[8]  Case No. 5:18-cr-00022-EKD-JCH, ECF No. 30 (W.D. Va. 2020).  In *United States v. Channing Lacey*, the defendant distributed fentanyl inside a jail.  One inmate died and three others sustained serious bodily injury.  The defendant was sentenced to 135 months' imprisonment.  Case No. 3:15-cr-0098-HZ-1, ECF No. 197 (D. Or. 2020).

Even when the government has been able to prosecute higher-level suppliers—those who supply user-dealers and street-level dealers—courts have still sentenced those defendants below 20 years when given the ability to do so.  *See, e.g.*, *United*

---

[7] Morgan Godvin, The Washington Post, *My friend and I both took heroin.  He overdosed.  Why was I charged with his death?*  (Nov. 26, 2019), *available at* https://www.washingtonpost.com/outlook/my-friend-and-i-both-took-heroin-he-overdosed-why-was-i-charged-for-his-death/2019/11/26/33ca4826-d965-11e9-bfb1-849887369476_story.html (noting that user-dealers are the most common kind of dealer, the most visible to law enforcement, and therefore the easiest to arrest); *see also supra* note 1 at 3 ("The vast majority of charges are sought against . . . family, friends, acquaintances, and people who sell small amounts of drugs, often to support their own drug addiction.").

[8] Mansfield's supplier received a sentence of 168 months' imprisonment.

20

*States v. Yeffry Reynoso*, Case No. 1:17-cr-10350-NMG, ECF No. 74 (D. Mass. 2019) (sentencing defendant, a heroin and fentanyl supplier to street dealers in five cities, to 150 months' imprisonment after one customer's fatal overdose)[9]; *United States v. Leandro Acevedo Lozada*, Case No. 8:17-cr-00269-PWG, ECF No. 174 (D. Maryland 2019) (sentencing defendant, who was a fentanyl, heroin, and cocaine supplier to street dealers and who possessed a loaded firearm when arrested, to 150 months' imprisonment after one customer's fatal overdose)[10]; *United States v. Kevin Scott Ta*, Case No. 2:18-cr-00194-JCC, ECF No. 51 (W.D. Wash. 2019) (imposing 144-month sentence on defendant who was a convicted bank robber, armed himself with nine firearms to protect his drug dealing, and continued to sell drugs even after being informed that one of his customers had died of a fentanyl overdose).[11]

Consistent with other parts of the country, the courts in this District have likewise recently sentenced individuals involved in overdose deaths to less than 20 years when given the opportunity to do so.  While it had been historically rare for the U.S. Attorney's Office in this District to charge individuals with the 20-year mandatory-minimum for drug crimes resulting in overdose deaths, these charges have ramped up since 2019.  This appears to be due to the Attorney General's policy shift toward filing the most serious charge available in these cases.[12]  In a number of cases,

_____

[9] *See also* U.S. Attorney's Office, District of Massachusetts, *Lynn Man Sentenced for Distributing Heroin and Fentanyl* (June 25, 2019), *available at* https://www.justice.gov/usao-ma/pr/lynn-man-sentenced-distributing-heroin-and-fentanyl.

[10] *See also* U.S. Attorney's Office, District of Maryland, *Defendant In Gaithersburg Drug Distribution Conspiracy Sentenced to More Than 12 Years in Federal Prison* (June 25, 2019), *available at* https://www.justice.gov/usao-md/pr/defendant-gaithersburg-drug-distribution-conspiracy-sentenced-more-12-years-federal.

[11] *See also* U.S. Attorney's Office, Western District of Washington, *Drug Dealer Illegally Armed with Nine Firearms Sentenced to Twelve Years in Prison* (June 18, 2019), *available at* https://www.justice.gov/usao-wdwa/pr/drug-dealer-illegally-armed-nine-firearms-sentenced-twelve-years-prison.

[12] *See* Nancy Gertner (U.S. District Judge, retired), The Washington Post, *William Barr's new war on drugs* (Jan. 26, 2020), *available at* https://www.washingtonpost.com/opinions/2020/01/26/william-barrs-new-war-drugs/.

the government has extended plea offers below the 20-year mandatory minimum.  In all of these cases that have reached sentencing (of which defense counsel is aware), the defendant has received a sentence below 20 years.  *See, e.g.*, *United States v. Edwin Lopez*, Case No. ED CR 21-109-VAP, ECF No. 53 (C.D. Cal. 2022) (sentencing defendant to 120 months' imprisonment); *United States v. Andrew Madi*, Case No. CR 18-846-PSG, ECF No. 100 (C.D. Cal. 2022) (sentencing defendant to 144 months' imprisonment); *United States v. Julian Miles Mayers-Johnson*, Case No. CR 19-270-ODW, ECF No. 99 (C.D. Cal. 2021) (sentencing defendant to 156 months' imprisonment); *United States v. Ryan Michael Reavis*, Case No. CR 19-594-ODW-2, ECF No. 207 (C.D. Cal. 2022) (sentencing defendant to 131 months' imprisonment); *United States v. Stephen Andrew Walter*, Case No. CR 19-594-ODW-1, ECF No. 215 (C.D. Cal. 2022) (sentencing defendant to 210 months' imprisonment).

In light of these below-20 year sentences in overdose death cases—both in this District and elsewhere—a sentence above 20 years in this case would create unwarranted sentencing disparities.

**D.    Seriousness of the offense, respect for the law, just punishment, adequate deterrence, protection of the public, and needed rehabilitation**

In a case as tragic as this one, it is understandable to want to do whatever we can to stop the opioid overdose problem afflicting our country.  But penalizing Mr. Tomasovich beyond the harsh 20-year mandatory minimum is not the answer.

A 20-year sentence already severely punishes Mr. Tomasovich for an outcome that he did not intend.  In a criminal justice system that typically increases punishment based on culpability, it is somewhat aberrant that the death-resulting enhancement imposes strict liability irrespective of intent.  There is no difference in culpability between a defendant who distributes drugs to a person who happens to overdose and one who distributes drugs to a person who does not overdose.  In both situations, the defendant's actions and intent are the same.  In both situations, the defendant does not

22

intend to hurt the other person.  Overdose is simply a possibility whenever someone uses drugs.

Moreover, 20 years is an extremely long time.  If Mr. Tomasovich is released at forty-five years old (with credit for good behavior), he will have spent more than one-third of his life in prison.  A 20-year sentence is 40.5 times longer than his longest prior sentence (just 180 days in 2018 (PSR ¶ 36)).  Mr. Tomasovich has already lost his father while incarcerated, and it is certainly possible, perhaps even likely, that he will lose his 69-year old mother and other family members during his prison term.  The 20-year mandatory minimum is sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  18 U.S.C. § 3553(a)(2)(A).

Moreover, research indicates that imposing a longer prison sentence does not equate to increased deterrence.  As one report concluded, "existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison terms," and "research findings imply that increasingly lengthy prison terms are counterproductive."[13]

This is specifically true with drug offenses.  For example, in 2011, researchers found that "[c]hanges in hard drug arrest rates did not predict changes in [injection drug use] population rates."[14]  A recent 50-state study also found no relationship between state drug imprisonment rates and drug use or overdose deaths."[15]  In fact, the Office for National Drug Control Policy has found that, despite the increase in sentences and sentence severity for drug-related crimes, the rates of current use of controlled

---

[13] Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, (Nov. 2010), https://www.sentencingproject.org/wpcontent/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.

[14] Samuel R. Friedman et al., *Drug Arrests and Injection Drug Deterrence*, American Journal of Public Health 101, no. 2 (2011): 344-249.

[15] Pew Charitable Trusts, *Letter to The President's Commission on Combating Drug Addiction and the Opioid Crisis RE: The Lack of a Relationship between Drug Imprisonment and Drug Problems* (June 2017), https://www.pewtrusts.org/~/media/assets/2017/06/the-lack-of-a-relationship-between-drug-imprisonment-and-drug-problems.pdf.

23

substances has continued to increase among Americans age 12 and older, from 6.7% reporting use in 1990 to 9.2% in 2012.[16]  Particularly relevant to this case, the Drug Policy Alliance has found that while the number of drug-induced homicide prosecutions and their mentions in the media have increased in a number of states, this has not slowed or reduced the overdose deaths in those locales.[17]  There is simply no evidence that long sentences have any deterrent value to drug-addicted individuals who are driven not by rational behavior, but by impaired neurological functioning.  In fact, such prosecutions may actually discourage people from seeking aid during an overdose, which inevitably leads to more deaths.[18]  Therefore, the 20-year mandatory minimum is sufficient to afford adequate deterrence and protect the public from further crimes.

Finally, a 20-year sentence is sufficient to provide Mr. Tomasovich with needed rehabilitation.  Mr. Tomasovich requests that the Court recommend FCI Sheridan because it is close to family, and offers both the BRAVE Program and RDAP to treat his mental health and addiction issues, respectively.  (Ex. H ¶¶ 16-17.)  Twenty years is

---

[16] Office of National Drug Control Policy, *National Drug Control Strategy: Data Supplement 2014* (2014).

[17] *See, e.g.*, *Supra* Note 1 at 21 (in Wisconsin, 20% increase of drug-induced homicide prosecution media mentions since 2011, but 70% increase in drug overdose deaths from 2005 to 2015); *id.* at 26 (in Illinois, 20% increase of drug-induced homicide prosecution media mentions since 2011, but 7.6% increase in overdose deaths from 2014 to 2015); *id.* at 30 (in Pennsylvania, 124% increase of drug-induced homicide prosecution media mentions between 2011 and 2016, but 37% increase in overdose deaths in 2016); *id.* at 31 (in New York, 97% increase of drug-induced homicide prosecution media mentions since 2011, but 20.1% increase in overdose deaths between 2014 and 2015); *id.* at 32 (in New Jersey, 61% increase of drug-induced homicide prosecution media mentions since 2011, but 16.4% increase in overdose deaths from 2014 to 2015); *id.* at 35 (despite a 50% increase since 2011 in Louisiana's media mentions of drug-induced homicide prosecutions, overdose deaths in Louisiana increased by over 12% from 2014 to 2015); *id.* at 36 (despite an increase of more than 40% since 2011 in North Carolina's media mentions of drug-induced homicide prosecution, overdose deaths in North Carolina increased by 14.5% from 2014 to 2015).

[18] *Id.* at 2, 3.

24

more than sufficient for Mr. Tomasovich to complete these programs, as the BRAVE Program is a 6-month program available to individuals with sentences of 60 months or more, and RDAP is delivered in 9 to 12 months to inmates with 22 to 42 months remaining on their sentence.[19]

## V. CONCLUSION

As a result of his own severe drug addiction, mental health issues, lack of effective mental health treatment, and negative life events, Mr. Tomasovich sold half a gram of fentanyl to G.A.M. for $80. He will have to live with the repercussions of that action for the rest of his life. But imprisoning him for more than 20 years would only compound the tragedy in this case. A sentence of 20 years in prison and 3 years of supervised release is a lengthy and sufficient punishment.

Furthermore, Mr. Tomasovich respectfully requests that the Court impose a fine of $1,001 to assist him with getting into the UNICOR program, and that the Court include the following language in the Judgment & Commitment Order:

> The Court strongly recommends designation to the FCI Sheridan BRAVE
> Program to best address the defendant's correctional treatment needs.
> Should the BOP calculate his security level to be high security, the Court
> requests an appropriate management variable be applied at their discretion.
> If the BOP is unable to accommodate placement at FCI Sheridan, the
> Court requests to be notified in writing as to the reason for non-
> compliance and an alternate be chosen with input from counsel.

Respectfully submitted,

DATED: August 12, 2022

By   /s/ Isabel Bussarakum
ISABEL BUSSARAKUM
Deputy Federal Public Defender
Attorney for TRENT TOMASOVICH

---

[19] Federal Bureau of Prisons, *Directory of National Programs* (May 18, 2017) at 9, 13, *available at* https://www.bop.gov/inmates/custody_and_care/docs/20170518_BOPNationalProgram Catalog.pdf.